## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

HORACE MONTAGUE,

        Plaintiff,

        v.

PATRICK CONROY, Warden, Maryland
House of Corrections-Annex,

BURLIE FRANK, Head of Security,
Maryland House of Corrections-Annex,
and

JOHN DOE, Head of Records Maryland
House of Corrections-Annex,

        Defendants.

Civil Action No.  AW-03-3191

---

## MEMORANDUM OPINION

This 42 U.S.C. § 1983 action involves, *inter alia*, an alleged Eighth Amendment violation, arising out of an incident at the Maryland House of Corrections where Plaintiff Horace Montague ("Plaintiff" or "Montague"), an inmate, suffered severe physical injuries after he was stabbed five times with a shank knife by fellow inmate Nathan Lee.  Plaintiff contends that Defendants Patrick Conroy, Burlie Frank, and a John Doe Defendant (collectively, "Defendants" or "prison officials"), all of whom are State officials at the Maryland House of Corrections, were deliberately indifferent, in violation of various federal and state constitutional provisions, by housing his "known enemy" in same unit where Montague was assigned.

Currently pending before this Court is Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [12].  The Court has reviewed the pleadings and applicable law.  On June 13, 2005, this Court held a hearing on the aforementioned motion.  For the following reasons, Defendants'

motion is granted.

FACTUAL & PROCEDURAL BACKGROUND

A.      Factual History

Montague was housed as an inmate in B Tier of the "D" Building of the Maryland House of Corrections — Annex in Jessup, Maryland — the same tier on which fellow inmate Nathan Lee ("Lee")[1] was housed.  Within prison, Lee had incurred 16 assault infractions prior to his encounter with Montague.  As a result of Lee's finding of guilt for a July 15, 2001 fight with another inmate, Lee received a segregation sentence of 210 days.  Lee was released from segregation on February 10, 2002.

On February 11, 2002, at approximately 1:15 p.m., the inmates housed in "D" building were returning from a lunch meal.  As the inmates entered the "D" building, wing officers directed them to their perspective wings in order to be locked down.  While entering the "D" building, and proceeding towards the "B" Wing, Montague was physically assaulted with a weapon by Lee.  Montague was repeatedly stabbed by Lee, in the upper torso, with a 9 ½ inch sharpened piece of metal ("shank knife").  Montague retreated towards the entrance of the building trying to defend himself by swinging a net bag filled with a can of tuna fish.  Direct orders were given to inmate Lee to drop the weapon and Lee refused.  After direct orders were repeated and inmate Lee still refused to obey, a burst of chemical agent — pepper spray — was deployed in the area of the combating inmates.  Once the chemical agent made contact both inmates immediately separated, and inmate Lee was placed in handcuffs.  Montague was escorted to the University of Maryland Shock Trauma Unit.  Inmate Lee was escorted to medical, treated, and sent to "A" Building

---

[1] From 1997 up to the assault upon Montague on February 11, 2002, Lee had incurred 17 separate assault infractions.

pending disciplinary action.  Both inmates received a Notice of Infraction.  Inmate Montague returned to the prison institution from Shock Trauma on February 11, 2002, and was subsequently housed in "B" Building pending disciplinary action.  As a result of the attack Montague suffered severe physical injuries.

Prior to the incident on February 11, 2002, Montague and Lee had a previous violent incident where Montague was believed to have been the assailant.  On October 21, 1999, Montague was charged in criminal court with assaulting Lee.  Montague denied involvement in the alleged October 21, 1999 incident with Lee.[2]  Following a trial, Montague was acquitted of assaulting Lee.

The Prison had a security policy for keeping persons who were enemies separate and apart. Known as Division of Correction Directive ("DCD") 100-119, issued March 1, 1995, it provided in pertinent part:

> A.    Whenever an inmate *claims* to have an enemy within the Division of Correction, the staff members receiving the claim shall complete or shall have the inmate complete an Enemy Alert Form, DC Form 100-119aR.  If the staff member is not the inmate's assigned case management specialist, the complete form shall be forward to the inmate's assigned case management specialist as soon as possible [later provisions provide that the inmate's assigned case management specialist "shall attempt to verify the inmate's claim(s)."].

DCD 100-119 (Plaintiff's exhibit 6).  A change notice to DCD 100-119 was issued effective April 1, 2000, which provided for automatic placement.  It states, as follows:

> D. When there are confirmed reports that two or more inmates have had serious altercations, they *shall* be listed as enemies of each other.  "Confirmed reports" means disciplinary reports, incident reports, police reports, reports from jail and/or detention

---

[2]   Montague pled guilty, at an adjustment hearing, to the assault on Lee Montague received a 60 day segregation sentence.  It appears from this Court's review of the record and oral arguments from the parties, however, that Montague pled guilty to assaulting Lee only because the adjustment hearing officer threatened him with 365 days of segregation rather than 60 days.

centers, or any other document by a third party that shows an altercation, dispute, or other incident between the parties.

DCD 100-119 (Plaintiff's exhibit 2).  Pursuant to the prison's policies, during annual reviews with case management workers it was noted whether the inmate had enemies or not.  If enemies were noted, then a paper enemy alert was generated.

Montague never asked prison officials to include Lee on his list of known enemies.  According to Montague, he did not need to include Lee on his enemy list because, although he had been accused, he never assaulted Lee.  Even after the February 11, 2002 stabbing incident, Montague contended that he had no known enemies and rejected an offer by prison officials to maintain him in protective custody.

From his initial incarceration in 1994 until June 1, 2002, Lee also listed no individuals on his enemy list.  After the February 11, 2002 incident with Montague, Lee included Montague and two other inmates with the same last name as enemies.  On September 25, 2003, however, Lee signed a retraction form for the Montagues among others.  Nevertheless, Horace Montague remains on Lee's enemy list.

It is undisputed that had the automatic placement policy (April 1, 2000 policy) been in effect at the time of the 1999 incident between Lee and Montague, the prison officials would have had a duty to unilaterally place the two inmates on the "enemy list."  Defendants contend that because the automatic placement policy was not effective until April 1, 2000, at the time of the alleged 1999 incident between Montague and Lee, Defendants had no duty to unilaterally place names on the two inmates enemy lists without the inmates consent or request.  Montague argues that the April 1, 2000 change in policy was not a novel concept, but rather reflected a long existing recognition that inmates who had conflicts with each other were enemies and should be separated.  The sole question presented here is whether, as a result of

4

the alleged 1999 incident where Montague allegedly assaulted Lee, Defendants were deliberately indifferent in failing to take affirmative steps to place Lee on Montague's "enemy list," thereby keeping the two inmates separate and apart from each other, and preventing future violence between the two inmates.

### B.      Procedural Background

On June 5, 2002, Montague filed a grievance with the Inmate Grievance Office ("IGO"), alleging that the February 11, 2002 assault would not have occurred except for the Division of Correction's negligence in placing Lee, his "known enemy," into a cell in the same building and on the same wing as Montague was assigned.  On November 26, 2002, Administrative Law Judge Marleen B. Miller ("ALJ Miller") conducted a hearing at the Maryland House of Corrections Annex in Jessup, Maryland.  At that time, no attorney ever entered an appearance in the matter and therefore Montague represented himself *pro se*.  On February 11, 2003, ALJ Miller entered an Order concluding as a matter of law that Montague failed to meet his burden by proving the DOC acted arbitrary or capriciously or in violation of law in failing to list Lee on Plaintiff's enemies list or in housing Lee in the same building and on the same wing as Plaintiff. In particular, ALJ Miller found:

> The previous alleged altercation between Nathan Lee and [Montague] occurred prior to the April 2002 change to DCD 100-119.  Therefore, the DOC had no duty to list those individuals as enemies unless one or both made a "claim."  Yet, [Montague] not only failed to claim Nathan Lee was or is his potential enemy, [Montague] affirmatively denied it. Moreover, were I to find that the DOC had an obligation to list the two inmates as enemies and keep them separate, [Montague] failed to present any evidence at the hearing to support his claim for damages.

See Page 7 of ALJ Opinion in Exhibits filed by Defendants.

Plaintiff, now represented by council, filed this action against Defendants in this Court on November 5, 2003 alleging numerous federal and state constitutional violations.  On September 30, 2004, Defendants

filed a Motion to Dismiss or, in the alternative, Motion for Summary Judgment.  This motion is ripe and an

opinion is now issued.

## DISCUSSION

A.    Standard of Review

With regard to Plaintiff's Section 1983 claims, Defendants contend that they are entitled to

summary judgment on qualified immunity grounds.[3]  Summary judgment is appropriate when there is no

genuine issue of material fact and judgment for the moving party is warranted as a matter of law.  Fed. R.

Civ. P. 56(c).  A genuine issue of material fact arises where evidence exists such that a reasonable jury

could find for the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

585-86 (1986).  When evaluating an assertion of qualified immunity under summary judgment, "the facts

are to be taken in the light most favorable to the party asserting the injury."  Clem v. Corbeau, 284 F.3d

543, 550-51 (4th Cir. 2002) (quotations omitted).

The legal principles governing qualified immunity analysis are well established.  As against claims

under federal law, "governmental officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S.

800, 818 (1982); see Jones v. Buchanan, 325 F.3d 520, 531 (4th Cir. 2003) (declaring that "qualified

immunity operates to ensure that before [governmental actors] are subject to suit, officers are on notice that

---

[3]Because both Plaintiff and Defendants have submitted lengthy exhibits in favor of or in
response to the Motion to Dismiss or, in the alternative, Motion for Summary Judgment, the Court will
treat the aforementioned motion as a Motion for Summary Judgment.

their conduct is unlawful"). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," the qualified immunity inquiry must be resolved by the trial judge at the earliest possible stage in litigation. <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).

Entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." <u>Saucier v. Katz</u>, 533 U.S. 194, 200 (2001). As a "threshold question," a court must ask whether, "taken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." <u>Id</u>. at 201. The next sequential step is to ask whether the right was "clearly established" at the time of the alleged offense. <u>Id</u>. If the facts do not show a constitutional violation, then the analysis ends and the plaintiff cannot prevail. <u>Id.</u>

B.    Analysis

In seeking summary judgment, Defendants allege that Plaintiff has failed to show the first prong of qualified immunity — a violation of a federal constitutional right. The Eighth Amendment imposes a duty upon prison officials "to protect prisoners from violence at the hands of other prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 843 (1994). "Gratuitously allowing the beating . . . of one prisoner by another serves no legitimate penological objective any more than it squares with evolving standards of decency." <u>Id.</u> at 833. However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." <u>Id.</u> at 834.

To establish a claim under Section 1983, for failure to protect from violence, an inmate must show: (1) serious or significant physical or emotional injury,"[4] and (2) that the prison officials had a "sufficiently

_____

[4] Here, it is uncontroverted that Montague presented evidence of significant physical injury from the allegedly unconstitutional conditions. Therefore his alleged deprivation is "sufficiently serious" to

culpable state of mind." <u>Odom v. S.C. Dep't of Corr.</u>, 349 F.3d 765, 770 (4th Cir. 2003).  When an

inmate challenges the conditions of his confinement under the Eighth Amendment, the requisite "state of

mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u>  In order to be liable under this

standard, "the official must be both aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u>  "Deliberate indifference

is a very high standard — a showing of mere negligence will not meet it." <u>Grayson v. Peed</u>, 195 F.3d 692,

695 (4th Cir. 1999).

Plaintiff argues that Defendants were deliberately indifferent to the danger caused by prisoners, and

in particular to Montague, by failing to establish and maintain procedures wherein prisoners known to be

danger to others would be affirmatively placed on an enemies list and kept separate from each other.

Liability under a deliberate indifference standard requires two showings:  (1) "the evidence must show that

the official in question subjectively recognized a substantial risk of harm;" and (2) the evidence in question

must show that the official in question subjectively recognized that his actions were "inappropriate in light

of that risk."  <u>Parrish v. Cleveland</u>, 372 F.3d 294, 303 (4th Cir. 2004).  As to both elements, "it is not

enough that the official *should have* recognized that his actions were inappropriate; the official actually

*must have* recognized that his actions were inappropriate." <u>Rich v. Bruce</u>, 129 F.3d 336, 340 n.2 (4th

Cir. 1997).

During oral argument and in his brief, Montague contended that Defendants were deliberately

_____

survive summary judgment on the first element under <u>Farmer</u>.  <u>See</u> <u>Case v. Ahitow</u>, 301 F.3d 605, 606
(7th Cir. 2002) (serious physical injuries received in violent assault by fellow inmate were sufficiently
serious under the Eighth Amendment).

indifferent because (1) the prison officials knew that there existed a conflict between Lee and Montague as evidenced by the assault charges in 1999; (2) the prison officials knew that Lee had a propensity for violence as evidenced by his dangerous history of past violence; (3) the prison officials knew that Lee had a motive to attack Montague due to Montague's acquittal in the previous October 1999 assault; and (4) that an implicit policy existed that these two inmates should have been segregated.  Viewing the evidence in the record in the light most favorable to Montague, this Court cannot find that the Defendants knew that housing Lee and Montague in the same unit exposed Montague to a specific risk, distinct from the general risks to which the Defendants were aware.

Rich is particularly instructive to the instant case.  In Rich, a prison inmate, Rich, sued a prison guard, Bruce, on a theory of Eighth Amendment deliberate indifference because another inmate, Higgins, attacked Rich while he was in Bruce's custody.  129 F.3d at 336-38.  On the date of the event giving rise to the suit, Bruce had removed Rich from his cell and placed him in an outdoor recreational area.  Id. at 337.  While Rich was in this recreational area, Bruce removed Higgins from his cell and placed him in an indoor recreational area, despite the fact that prison regulations prohibited the removal of more than one inmate at a time from his cell for recreation.  Id.  While Bruce was returning Rich to his cell, Higgins escaped from the indoor recreational area and attacked Rich.  Id.  The evidence showed (1) that Bruce was aware that Higgins posed a substantial risk to every inmate in the prison and especially to Rich, who previously had stabbed Higgins; (2) that Bruce recognized the general risk that inmates posed to one another in that particular prison; and (3) that Bruce deliberately violated regulations intended to prevent exactly the kind of inmate-on-inmate violence that actually occurred.  The Fourth Circuit held that these facts were not sufficient to justify a finding of deliberate indifference because the evidence did not show the

9

unique risks created by his actions in this case:

> These findings establish that Bruce knew, as a general matter, that Rich was at risk from other inmates, and from Higgins in particular, and that Bruce knew that his actions were in violation of [prison] regulations. They do not establish, however, that Bruce had *actual knowledge* that his actions *uniquely increased these general risks* to which Rich was exposed each and every day he was incarcerated . . .

Id. at 339.

As applied to the instant case, there is no dispute that Defendants recognized substantial risks associated with housing Montague and Lee in the same unit. Defendants certainly recognized that in light of Lee's institutional record, he was a dangerous individual who was a risk to the general population. Lee had an extensive history of assaults on both staff and other inmates. In particular, Lee had 17 separate assault infractions, including the assault upon Montague, and many of those infractions involved assaults with homemade weapons. Defendants likewise recognized that the general risk that maximum and medium security inmates pose to one another in the prison context. In short, Defendants recognized the general risks associated with housing dangerous inmates in a prison's general population.

No direct evidence in the record, however, indicates that Defendants were aware of the distinct risks associated with housing Montague and Lee in the same area distinct from the general risks of violence from other inmates and Lee to which Montague was always exposed. The record shows that the alleged 1999 altercation between Montague and Lee, Lee was discovered lying semi-conscious on the floor of the upstairs A-Wing Dayroom. There were five inmates in the area of the upper dayroom, and 25 inmates in the lower level dayroom at the time of the incident. Although Montague was given an infraction and placed on administrative segregation because a videotape frame observed him swinging an object at the victim, four other inmates were placed on administrative segregation pending an infraction.

Moreover, neither Montague nor Lee placed each other's names on their respective enemy lists between the October 1999 incident and the February 2002 incident. Nor does the record show any apparent communication between the two inmates and no threats of any nature. Even more importantly, although Montague pled guilty to the infraction charging him with the 1999 assault upon Lee, Montague denies involvement in the 1999 incident with Lee. Based on his own acknowledgment, Montague appears to have pled guilty to the 1999 incident with Lee only because an adjustment officer threatened him with 365 days of segregation rather than 60 days.

In short, based on these facts, the Court cannot find that Defendants had actual knowledge that placing the two inmates in the same housing would uniquely increase the general risks associated with incarceration. Stated differently, after setting aside 20/20 hindsight, as this Court must in conducting this assessment, Parrish, 372 F.3d at 305, the summary judgment evidence does not support a conclusion that the Defendants here "had been exposed to information concerning the [incremental] risk [associated with housing Lee and Montague in the same area] and thus must have known about it." Farmer, 511 U.S. at 842.

Even assuming that Defendants perceived an actual unique risk of violence here, the evidence does not support a finding of deliberate indifference. To succeed on deliberate indifference, an officer's response to a perceived risk must be more than merely negligent or simply unreasonable. See Brown v. Harris, 240 F.3d 383, 390-91 (4th Cir. 2004) (finding that an officer's "failure to take additional precautions was negligent, [*i.e.*,unreasonable under the circumstances,] and not deliberately indifferent." Indeed, the Fourth Circuit has emphasized that "where the evidence shows, at most, that [Defendants'] response to a perceived substantial risk was unreasonable under the circumstances, a claim of deliberate indifference

cannot succeed." <u>Parrish</u>, 372 F.3d at 307.

 As applied here, the written policy allowing for an affirmative placement of names on the enemy list was did not become effective until April 1, 2000.  Indeed, neither party disputes that, at the time of the 1999 incident between Lee and Montague, no official written policy existed compelling Defendants to affirmatively place inmates names on an enemy list in the absence of an inmate's request to do such. Quite the contrary, at the time of the alleged altercation between Lee and Montague, Defendants had no duty to list individuals as enemies unless one or both of them made a "claim."  Thus, Defendants had no affirmative duty to place names on the enemy list without an inmate requesting them to do so.  Montague not only failed to claim Lee as an enemy, Montague affirmatively denied it. There is no evidence that Defendants recognized that their actions were inappropriate under the circumstances.  Accordingly, this Court cannot find that Defendants' failure to unilaterally place Lee's name on Montague's enemy list constituted deliberate indifference.

 Montague attempts to argue that an *informal* and *unwritten* policy of Defendants automatically placing inmates names on other inmates enemy lists existed. At oral argument, Montague specifically alleged that Defendants were deliberately indifferent for failing to retroactively place Lee's name on Montague's enemy list after the implementation of a formal policy allowing for such.  Again, this Court cannot agree.

 The 2000 policy allowing for automatic placement of names is silent with regard to whether it applies retroactively.  While a reasonable interpretation of the policy might allow for a retroactive application, an equally reasonable interpretation might allow for only a prospective application. On the one hand, to the extent that Defendants interpretation of the 2000 policy is reasonable, their failure to place Lee's name on Montague's enemy list clearly cannot constitute deliberate indifference.  <u>See</u> <u>Farmer</u>, 511

U.S. at 844 (noting that under the deliberate indifference analysis, officials "may be found free from liability if they responded reasonably" to the circumstances).

On the other hand, to the extent that Defendants actions were an unreasonable interpretation of the 2000 policy, their actions still cannot constitute deliberate indifference.  In attempting to demonstrate deliberate indifference, Montague points out that the names of ten other inmates were placed on Lee's enemies list on February 12, 2002, the day after the second incident between Lee and Montague, without the consent or request of Lee.  This argument is unpersuasive, because these names were automatically placed on Lee's enemy list *after* a formal policy was implemented allowing for this automatic placement.  Moreover, while Defendants may have been negligent or even grossly negligent in failing to retroactively place Lee's name on Montague's enemy list, Defendants' omissions do not constitute deliberate indifference.  Even assuming the evidence presented shows that Defendants had actual knowledge of facts from which a reasonable person might have inferred a risk to Montague, that by itself does not present an Eighth Amendment violation.  Rich, 129 F.3d at 340 (finding that actual knowledge of facts from which a reasonable person might infer a risk does not violate the Eighth Amendment unless the inference was actually drawn).  There is simply no evidence in the record that Defendants actually drew that inference.  Therefore, Montague has failed to demonstrate deliberate indifference.

**CONCLUSION**

For the aforementioned reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

An Order consistent with these rulings shall follow.


June 17, 2005                                    /s/
Date                                    Alexander Williams, Jr.
                                        United States District Judge

14